IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| CHRISTINE FACEMYER,<br><br>    Plaintiff,<br><br><br><br><br>            vs.<br><br><br>UTAH DEPARTMENT OF CORRECTIONS,<br><br>    Defendant. | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br><br><br><br>Case No. 2:05-CV-00396 PGC |

Plaintiff Christine Facemyer filed a civil rights complaint under Title VII of the Civil Rights Act of 1964,[1] alleging sexual discrimination, hostile work environment and retaliation by the Utah Department of Corrections (DOC). After filing a charge of discrimination with the Utah Anti-Discrimination and Labor Division (UALD), she brings this suit. Specifically, she alleges that while employed at Fremont Community Correctional Center as an Adult Probation and Parole correctional officer, she was subjected to sexual discrimination by other correctional officers. She further alleges that other correctional officers created a hostile work environment by undermining her authority as shift leader and correctional officer because of her gender. And

---

[1] 42 U.S.C. § 2000e.

she further alleges that the DOC failed to promote her to an agent position and issued letters of warning in retaliation for her filing several complaints.  The DOC has filed a motion for summary judgment over Officer Facemyer's Title VII sexual discrimination, hostile work environment, and retaliation claims.  Based on the findings of fact and the case law discussed below, the court GRANTS IN PART AND DENIES IN PART the DOC's motion for summary judgment [#38].

## FINDINGS OF FACT

For the purpose of resolving this motion for summary judgment, the court finds the following relevant facts.  Since February 2002, Officer Facemyer has been a correctional officer employed by the DOC.  She first worked for the DOC at the prison, then transferred to Orange Street Community Correctional Center, then to Fremont Community Correctional Center, and then to Bonneville Community Correctional Center.  She currently works for the DOC at the Orange Street center, working with recently released offenders from a correctional facility.

In May 2003, Officer Facemyer transferred from Orange Street to Freemont.  Mike Renckert became her immediate supervisor, with Kathy Ockey as the Director of Fremont (and Mr. Renckert's supervisor).  Between May 2003 and January 2004, Officer Facemyer brought two formal complaints to Ms. Ockey.  In those two formal complaints, Office Facemyer raise a number of issues.  For example, she complained that fellow officer, Robert Cid, mistreated offenders, viewed women in swimsuits at the Las Vegas Hard Rock hotel web site, commented that vacuuming is "women's work," and made statements that Officer Facemyer was a worthless

officer because she could not perform urinalyses on the offenders.[2]  She also complained that Office Cid had at times stepped on her toes, flexed his hands and pounded his fists as he put on latex gloves, and drove recklessly to intimidate her.[3]  Officer Facemyer complained, not specifically against Officer Cid, that both male and female officers demeaned her, usurped her authority, and cancelled her orders regarding treatment of offenders.  Finally, she complained that Mr. Renckert spread a rumor that Officer Facemyer had destroyed evidence[4] while in the restroom, which "knocked her down" in the eyes of her fellow officers.[5]  Officer Facemyer does concede that her "complaint to Kathy Ockey was mostly about [Officer] Cid's treatment of the offenders."[6]

Upon receiving these complaints, Ms. Ockey supervised an investigation to deal with Officer Facemyer's allegations.  Ms. Ockey concluded that most of the incidents contributing to these complaints stemmed from a lack of communication between the officers.[7]  Ms. Ockey did find that Officer Cid had viewed the Hard Rock web site, and she warned him not to view it again.  Additionally, Ms. Ockey warned Officer Cid and other co-workers not to joke with Officer Facemyer because it might be misinterpreted.  She further determined that Officer Cid

---

[2] Decl. of Kathy Ockey at ¶¶ 8f, 8g, and 11b.

[3] *Id*. at ¶ 8(j)-(l).

[4] It is unclear what "evidence" either Officer Facemyer or Mr. Renckert meant.

[5] Plaintiff's Memo. in Opp. of Sum. Judg. Ex. B (Officer Facemyer email to Mr. Renckert).

[6]  Facemyer Depo. at 47:6-12.

[7] Ockey Decl. at ¶10.

was not harassing Officer Cid by stretching his latex gloves onto his hands or by pounding them

after he put them on.  Ms. Ockey also verbally warned Officer Cid not to speed in a state vehicle.

Finally, Mr. Renckert apologized to Officer Facemyer for his earlier statements, stating that he

had been joking and that he would avoid making comments that "knocked Officer Facemyer

down" in the future.

Although Ms. Ockey dealt with all of Officer Facemyer's complaints, Ms. Ockey noted

that three of her allegations clearly implicated gender issues: (1) Officer Cid calling Officer

Facemyer a prostitute, (2) Officer Cid regularly viewing pornography and viewing women in

bathing suits on the Las Vegas Hard Rock Hotel web site, and (3) Officer Cid and Scott Jackson

asking whether Officer Facemyer had feminine hygiene products in a backpack she always

carried, and their request to search that backpack.[8]  Ms. Ockey further investigated each of these

allegations in depth.  After investigating, she concluded that Officer Cid denied ever calling

Officer Facemyer a prostitute.  Moreover, Ms. Ockey found that Officer Facemyer herself made

statements (at a time when she was dissatisfied with her job) to both Ms. Ockey and Ann Ford,

another female officer, that she (i.e., Officer Facemyer) should quit and turn tricks on the streets

instead.[9]  Ms. Ockey also found no evidence that Officer Cid viewed pornography at work.

Lastly, Ms. Ockey interviewed Officer Cid and Officer Jackson, who both denied asking Officer

Facemyer about feminine hygiene products in her backpack.[10]  They both admitted, however, that

---

[8] *Id*. at ¶11.

[9] *Id*. at ¶11(a).

[10] *Id*. at ¶11(c).

they asked her what she kept in her backpack.  Ms. Ockey issued warnings to both Officer Cid and Officer Jackson to refrain from any further teasing of Officer Facemyer.  After Ms. Ockey determined that Officer Cid and Officer Facemyer would not be able to work well together, DOC transferred Officer Cid to a different shift.[11]

After investigating both complaints, Ms. Ockey instructed Officer Facemyer to talk to her again if Officer Cid or others did not stop the inappropriate behavior reported by Officer Facemyer.[12]  In her deposition, Officer Facemyer stated that Officer Cid's behavior stopped after she complained to management,[13] and Officer Facemyer never raised the same complaints to Ms. Ockey again.[14]

According to her deposition testimony, Officer Facemyer also formally complained two or three times to Mr. Renckert.  Those complaints mirrored her complaints to Ms. Ockey, including allegations that Officer Cid stepped on Officer Facemyer's toes, made threatening gestures, continued to watch pornography at work, talked about bringing his gun to work and talked generally with another officer about buying wives from Turkey that they could club over the head and drag back home.[15]  Mr. Renckert reported these allegations to Ms. Ockey, who

---

[11] *Id*. at ¶ 13.

[12] *Id*. at ¶ 16.

[13] Facemyer Depo. at 25:24-26:2.

[14] Ockey Decl. at ¶ 16.

[15] Facemyer Depo. at 43:24-44, 44:11-14, 49:15-51-18, and 34:6-18.

investigated them as part of her formal investigation.[16]  Ms. Ockey concluded as part of her investigation that Officer Facemyer's allegations did not rise to the level of harassment.[17]  After that, Officer Facemyer did not complain to any of her direct supervisors again, but she does state that another guard, John Cole, did complain about Officer Cid at a later time.[18]

In January 2004, Mike Renckert, issued a verbal warning to Officer Facemyer that she needed to improve her interpersonal skills.  He issued this warning based on complaints raised by both male and female co-workers regarding Officer Facemyer's lack of professionalism and communication skills.[19]

Later the same day, Officer Facemyer requested a meeting with Brent Cardall, the Regional Administrator of Adult Probation and Parole.  At that meeting, Officer Facemyer reiterated many of her previous complaints that she had made to Ms. Ockey and Mr. Renckert.  Specifically, she complained that Officer Cid physically threatened her, made demeaning comments to her, and watched pornography.[20]  She also complained that Mr. Renckert was not following up on her complaints.[21]  Mr. Cardall immediately referred the complaint to human resources for investigation.

---

[16] Decl. of Miller at ¶ 12.

[17] Id. at ¶ 26.

[18] Facemyer Depo. at 54:1-10.

[19]Ockey Decl. at ¶ 18.

[20] *Id*. at ¶ 17; Deposition of Brett Cardall at 9:3.

[21] Cardall Depo. at 22:18-22.

Thomas McLelland conducted the investigation, and Carita Eldredge participated in all the interviews.  They interviewed each person involved in Officer Facemyer's allegations.  The allegations raised by Officer Facemyer in her interview mirrored many of her previous allegations.  Specifically, she complained that Officer Cid made fun of her, stepped on her toes, called her a prostitute, pushed offenders' buttons, excessively used the internet, looked at a woman once on the Hard Rock web site, and brought speakers to hook up to the computer.[22]  She also complained that Officers Cid and Jackson made fun of her backpack and always asked her about its contents.  She further complained that Mr. Renckert commented that she had an offender clean the restroom before she used it to destroy evidence.[23]  And she complained that Ms. Ockey failed to throw a going-away party for any State employees, but that she had thrown such a party for a contract employee.[24]  Finally, she complained that another officer, Officer Stallings, gave his handcuffs to an offender, checked a weapon out for a month, and accepted free scones at Sconecutter from an offender.[25]

Mr. McLelland considered the following factors in determining whether Office Facemyer had been unlawfully harassed: (1) whether Officer Facemyer belonged to a protected class, (2) whether the harassment was based on her membership in that class, (3) whether the harassment was pervasive or to such an extent as to make a one time event result in or create a hostile or

---

[22] Declaration of Carita Eldredge at ¶ 7.

[23] Eldredge Decl. at ¶ 9.

[24] *Id*. at ¶ 10.

[25] *Id*. at ¶ 11.

abusive work environment, and (4) whether the conduct was unwelcome.[26]  Mr. McLelland

determined that "the alleged behavior did not rise to the level of unlawful harassment or

discrimination."[27]

Additionally, throughout the investigation process, several interviewees complained

about Officer Facemyer's behavior.  They complained that she herself created a hostile work

environment for other officers, used abusive and inappropriate language with co-workers, staff,

and offenders, offended and belittled co-workers, isolated herself during shifts, became upset

when things were not done her way, talked badly about co-workers in front of other staff and

offenders, and criticized co-workers on their job performance.[28]

In her follow-up interviews with Mr. McLelland, Officer Facemyer admitted using vulgar

language, but noted the regular use of such language at Fremont by co-workers.[29]  She

complained that her co-workers singled her out for her language.[30]  Based on the evidence and

investigation conducted by Mr. McLelland, both Officer Cid and Officer Facemyer received

reprimands for behaving unprofessionally and violating the DOC's Code of Conduct.  On March

5, 2004, both Officer Cid and Officer Facemyer received a Letter of Warning for their

---

[26] Eldredge Decl. at ¶ 13.

[27] *Id*. at ¶ 14.

[28] *Id*. at ¶ 12.

[29] Facemyer Depo. at 80:9-81:16.

[30] Facemyer Depo.  at 81:10-81:16.

unprofessional conduct.[31]  Officer Facemyer's Letter of Warning was based on using

inappropriate and vulgar language with both staff and offenders, criticizing co-workers

performance in front of staff and offenders, being overly aggressive and confrontational,

becoming irritated when things were not done the way she thought they should be done, isolating

herself in an office during her shift and not being available to staff to assist with matters needing

her attention, and, according to many of the staff, being in large part responsible for the negative

working environment at Freemont Street due to inappropriate interaction with co-workers.

Additionally, on May 27, 2004, Officer Facemyer received a performance evaluation

where she received a "successful" or "exceptional" rating in all but two categories: Interpersonal

Skills and Professionalism/Compliance with Code of Conduct.  In both of those categories, she

received a rating of "unsuccessful."[32]

On August 11, 2004, Officer Facemyer filed a Charge of Discrimination with the

UALD.[33]  Scott Carver, the DOC's Deputy Director, directed the Office of Professional Standard

and Ethics to conduct an independent investigation.  On September 13, 2004, Leslie Miller began

her investigation and interviewed Officer Facemyer.  Ms. Miller also subsequently interviewed

Ann Ford, Robert Cid, and Antonio Rios, another officer whom Officer Facemyer claimed

harassed her.  Ms. Miller conducted further interviews with Jeff McCleod, Mr. Renckert, and Ms.

Ockey, the people that Officer Facemyer now claims failed to act on her complaints of

---

[31] Eldredge Decl. at ¶¶ 16-17.

[32] Def's Memo. in Supp. of Summ. Judg., Ex. B. at 3.

[33] Complaint at 7; Declaration of Leslie Miller at ¶ 2.

harassment.

During the DOC's independent investigation, Officer Facemyer complained that Officer Ford spread rumors about Officer Facemyer being pregnant and using drugs. She further complained that Officer Ford demeaned her in front of offenders and staff. Ms. Miller found no evidence to support Officer Facemyer's claims, but did conclude that both Officer Facemyer and Officer Ford had acted unprofessionally.[34]

Second, Officer Facemyer complained that Officer Rios had been insubordinate and escalated an incident with an offender, causing the offender to physically attack her. After investigation, Ms. Miller concluded that no evidence demonstrated that Officer Rios' behavior rose to the level of insubordination.[35] Nor did Ms. Miller find any evidence demonstrating that Officer Rios' actions caused the offender to attack Officer Facemyer.[36]

Third, Officer Facemyer complained that Officer Cid:

[B]elittled her in front of offenders and staff, physically assaulted her by intentionally stepping on her toes and elbowing her in the chest, threatened her on one occasion by pounding his fist into his hand, made disparaging statements that vacuuming was "women's work," teased her about her backpack and asked he if she had feminine hygiene products in it, commonly viewed pornography at work, teased her when she refused to go on a date with another officer, and excluded her from certain duties on shift."[37]

Upon investigation, Ms. Miller found that Officer Cid admitted to joking with and teasing

---

[34] Miller Decl. at ¶ 6.

[35] *Id*. at ¶ 7.

[36] *Id*.

[37] *Id*. at ¶ 8.

Officer Facemyer about vacuuming being women's work, as well as to joking about the contents of her backpack. Officer Cid denied asking Officer Facemyer about feminine hygiene products, intentionally stepping on her toes, or viewing pornography at work.  Officer Cid admitted to Ms. Miller that Officer Facemyer might feel excluded because the officers "preferred to avoid Facemyer, rather than work with her, because of the negative way she interacted with them."[38] Ms. Miller concluded that "there was no evidence rising to the level of unlawful harassment" by Officer Cid, and that even if the allegations were substantiated, which they were not, "they did not create a hostile work environment."[39]  Additionally, Ms. Miller found that both Officer Cid and Officer Facemyer had been unprofessional in their conduct with one another.[40]

Fourth, Officer Facemyer complained that Mr. McCleod (Officer Cid's supervisor) failed to act on her reports of harassment.  Based on the evidence, Ms. Miller concluded that Mr. McCleod has investigated the toe-stepping incident and concluded that it was an accident that was "neither intentional nor violent."[41]  Ms. Miller concluded that Mr. McCleod properly addressed Officer Facemyer's complaint.

Fifth, Officer Facemyer complained that Ms. Ockey failed to act on her harassment complaints. Additionally, Officer Facemyer complained that she had been wrongfully disciplined and given unfavorable assignments.  Ms. Ockey reported she had addressed all the gender-based

---

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] *Id.* at ¶ 9.

harassment claims, and reported that no repeat behaviors had been reported.[42]  Also, Ms. Ockey

reported that Officer Facemyer had requested the kitchen assignment and never asked for it to be

changed.  Lastly, Ms. Ockey stated that she appropriately disciplined Officer Facemyer for "her

problems communicating with other employees."[43]  Ms. Miller concluded that Ms. Ockey

addressed Officer Facemyer's complaints in a timely manner, and that Officer Facemyer had not

been subjected to unlawful harassment, unfair assignments or wrongful discipline.[44]

  Sixth, Officer Facemyer complained that Mr. Renckert failed to act on her reports of

harassment.  Officer Facemyer specifically claimed that she reported threats, violence, and

demeaning behavior to Mr. Renckert and that he refused to give her grievance forms and failed to

promote her.[45]  Mr. Renckert reported that most of the allegations Officer Facemyer brought

happened before he transferred to Fremont, but he reported these complaints to Fremont's

administration and had been told that the administration had addressed the complaints.[46]  Mr.

Renckert denied that Officer Facemyer asked him for a grievance form, and Ms. Miller

concluded that the issue could not be substantiated.[47]  Ms. Miller also concluded that Mr.

Renckert addressed Officer Facemyer's complaints in a timely manner.  Finally, she concluded

---

[42] *Id*. at ¶ 10.

[43] *Id*.

[44] *Id*.

[45] *Id*. at ¶ 11.

[46] *Id*.

[47] *Id*.

that Mr. Renckert did not have the authority to promote Officer Facemyer, so Officer Facemyer's

failure to promote complaint lacked any basis against Mr. Renckert.[48]

On September 9, 2004, Officer Facemyer received a second Letter of Warning.  This

letter focused on her behavior over the prior two months and stated that Officer Facemyer's

behavior toward both staff and investigators had "deteriorated to a very corrosive and

unprofessional level."[49]  Officer Facemyer's Letter of Warning was based on aggressive,

confrontational and demeaning interactions with staff and offenders, criticizing and ridiculing

staff performance, frequent absenteeism, isolation and irritability, and unprofessional and

insubordinate behavior during meetings with her supervisor.  The letter states that "Letters of

Warning are not disciplinary in nature," and are meant to "put you on notice that you should

closely monitor your interactions with fellow staff members and ensure your conduct comports

with professional standards."[50]

In late September 2004, Officer Facemyer transferred from Fremont to Bonneville.[51]  She

transferred "at the same rank, same salary step, same rate of pay, and same benefits."[52]  From

September 2004 to January 2005, she worked in a secretarial/clerical position.  After January

---

[48] *Id*. at ¶ 12.

[49] Defendant's Memo. In Supp. Of Sum. Judg., Ex B (Letter of Warning, September 9, 2004).

[50] *Id*. (September 9, 2004, March 5, 2004).

[51]  Facemyer Depo. at 85:24-86:1.

[52] *Id*. at 87:10-17.

2005, she worked as a shift leader once that position opened up at Bonneville.[53]

In February 2005, the United States Equal Employment Opportunity Commission issued Officer Facemyer a Right to Sue Letter.[54]  After receiving her right to sue letter from the EEOC, Officer Facemyer filed the instant complaint alleging three claims.  First, she alleged a hostile work environment due to harassment by co-workers, further alleging that she alerted the DOC to this environment but that the DOC failed to reasonably deal with her complaints.  Second, she alleged sexual discrimination by the DOC because it subjected her to adverse employment actions by not promoting her, giving her undesirable assignments, and holding her to a higher workplace standard than her peers.  Third, she alleged that the DOC had retaliated against her because of her complaints by physically and verbally abusing her, subjecting her to unfounded disciplinary investigations and actions, and failing to promote her to positions for which she was qualified.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[55]  The court must view the evidence, and draw reasonable inferences from that evidence,

---

[53] *Id*. at 87:1-9.

[54] Complaint at ¶ 9.

[55] Fed. R. Civ. P. Rule 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Cummings v. Norton*, 393 F.3d 1186, 1189 (10th Cir. 2005).

in the light most favorable to the nonmoving party.[56]  The nonmoving party may not, however,

"rest on mere allegations or denials of [its] pleading, but must set forth specific facts showing

there is a genuine issue for trial."[57]  "The mere existence of a scintilla of evidence in support of

the [non moving party's] position will be insufficient [to overcome summary judgment]; there

must be evidence on which the jury could reasonably find for [the non-moving party]."[58]

## DISCUSSION

Officer Facemyer's complaint lists three claims against the DOC: (1) hostile work

environment, (2) sexual discrimination by subjecting her to adverse employment actions based

on her gender, and (3) retaliation by failing to promote her and issuing her unwarranted letters of

warning.  Specifically, Officer Facemyer alleges that the DOC "created and/or permitted a hostile

work environment,"[59] the DOC's "actions were discriminatory and related to the Plaintiff's

sex,"[60] and the DOC retaliated against her "for the exercise of her protected rights under Title

VII."[61]

As to the first claim, the DOC argues that they responded reasonably and promptly to

each of her complaints.  Regarding the second claim, the DOC argues that Officer Facemyer fails

---

[56] *Cummings*, 393 F.3d at 1189; *Spaulding v. United States*, 279 F.3d 901, 904 (10th Cir. 2002).

[57] *Anderson v. Liberty Lobby*, 477 U.S. 242, 256 (1986).

[58] *Id*. at 252.

[59] Complaint at ¶ 14.

[60] *Id*. at ¶ 23.

[61] *Id*. at ¶ 33.

to demonstrate that she was subjected to adverse employment actions.  It further argues that even if she can demonstrate such adverse employment actions, the actions were legitimate and not based upon her gender.  Finally, as to her third claim, the DOC argues Officer Facemyer fails to demonstrate, again, any adverse employment actions, and even if she could demonstrate such actions, the actions were legitimate and not retaliatory in nature.

*A. Hostile Work Environment*

To establish a hostile work environment claim, "a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[62]   Furthermore, Officer Facemyer must show that she was not only subjected to severe and pervasive harassment, but that it was gender-based harassment.[63]   Severity and pervasiveness are evaluated according to the totality of the circumstances.[64]   The environment must be hostile both "objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."[65]  In determining whether an "environment is sufficiently hostile or abusive,"

---

[62] *Davis v. U.S. Postal Serv.*, 142 F.3d 1334, 1341 (10th Cir. 1998) (internal quotations omitted); *see also Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66-67 (1986) (not all harassment creates a hostile work environment; the harassment must be "sufficiently severe or pervasive to alter the conditions of employment").

[63] *Chavez v. New Mexico*, 397 F.3d 826, 832  (10th Cir. 2005).

[64] *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993); *Chavez*, 397 F.3d at 833; *Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1261 (10th Cir. 1998).

[65] *Harris*, 510 U.S. at 21-22.

the court must look to "'all the circumstances,' including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[66]

To survive summary judgment, Officer Facemyer must show that under the totality of the circumstances "(1) the harassment was pervasive and severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was [gender-based] or stemmed from [gender-based animus]."[67]   According to the Tenth Circuit, employer liability arises from situations where another co-worker creates a hostile work environment through harassment, the employer had actual or constructive knowledge of this hostile work environment, and the employer failed to reasonably respond to the hostile work environment.[68]   Also, "an employer is only potentially liable for negligence in remedying and preventing harassment of which it negligently failed to discover."[69]   The court must make two inquiries; "first, into the employer's actual or constructive knowledge of harassment, and second, into the adequacy of the employer's remedial and preventative responses to any actually or constructively known harassment."[70]

### 1. DOC Knew of the Potentially Hostile Work Environment.

Officer Facemyer has adequately demonstrated that the DOC knew of the potentially

---

[66] *Id*. at 23; *O'Shea v. Yellow Tech. Servs. Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999).

[67] *Trujillo v. Univ. of Colo. Health Scis. Ctr.*, 157 F.3d 1211, 1214 (10th Cir. 1998).

[68] *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 673 (10th Cir. 1998).

[69] *Id*.

[70] *Id*.

hostile work environment.  Officer Facemyer complained to her supervisor, Ms. Ockey, twice; once the day she was promoted to shift leader[71] and a second subsequent time.[72]  Officer Facemyer and Mr. Renckert also met twice; once shortly after he became her supervisor[73] and the day of the chili cook-off.[74]  Officer Facemyer also complained at least once to Mr. McLeod about Officer Cid stepping on her toes, which he investigated and determined not to be intentional.[75]  As a result of all these meetings, Ms. Ockey investigated and issued verbal warnings to the employees causing any substantiated problems to Officer Facemyer.[76]

Subsequently, when Officer Facemyer complained to Mr. Cardall, he immediately requested that Human Resources investigate her allegations.[77]  Finally, when Officer Facemyer filed her UALD complaint, the DOC authorized further investigations into her claims.[78]  It is also clear that Officer Facemyer did not report several complaints to DOC, including her complaint that Officer Cid compared her breasts with an offender and being teased about her sexualty after

---

[71] Facemyer Depo. at 20:2-7, 158:18-22.

[72] *Id*. at 48:5-22.

[73] *Id*. at 43:7-13.

[74] *Id*. at 49:11-15, 159:3-9.

[75] Miller Decl. ¶ 9.

[76] Ockey Decl. at ¶¶ 14-15.

[77] Eldredge Decl. at ¶¶ 2, 4. Cardall Depo. at 9"14-10:4, 23:13-24:4.

[78] Miller Decl. at ¶ 3.

turning down an officer for a date.[79]  "Actual knowledge will be demonstrated in most cases

where the plaintiff has reported harassment to management-level employees."[80]  Given the

undisputed facts, it is clear that the DOC had actual knowledge of many of Officer Facemyer's

complaints.

### 2. The DOC Adequately Responded to Officer Facemyer's Claims

According to the Tenth Circuit, "the touchstone for the evaluation of an employer's

response under *Meritor* [*Savings Bank, FSB v. Vinson*][81] and [*Hicks v. Gates Rubber Co.*,][82] is

reasonableness."[83]  As long as the employer takes appropriate remedial or preventative action to

remedy the harassment, the employer may discharge its obligations.[84]  The Tenth Circuit has

focused on "promptness and effectiveness" when discussing an employer's response in past

cases.[85]  Indeed, the "stoppage of the harassment by the disciplined perpetrator evidences

effectiveness," and the Tenth Circuit's test specifically asks "whether the remedial and

preventative action was 'reasonably calculated to end the harassment.'"[86]  Of course, a response

---

[79] Facemyer Depo. at 17:23-24, 26:5-27:11, 27:27-29:7.

[80] *Adler*, 144 F.3d at 673.

[81] 477 U.S. at 72.

[82] 833 F.2d 1406, 1417-18 (10th Cir. 1987).

[83] *Adler*, 144 F.3d at 675-76.

[84] *See Meritor*, 477 U.S. at 72.

[85] *Adler*, 144 F.3d at 676; *Hirschfield v. New Mexico Corrections Dep't*, 916 F.2d 572, 578 (10th Cir. 1990).

[86] *Adler*, 144 F.3d at 376 (quoting *Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir. 1991)).

may be reasonably calculated to stop the harassment, even though the perpetrator may persist in his actions.[87]  If effectiveness is not evidenced by stoppage, the court must consider the timeliness of the complaints, any undue delay, "and whether the response was proportional to the seriousness and frequency of the harassment."[88]  Reasonable responses include prompt investigation, proactive solicitation of complaints, scheduling changes and transfers, oral or written warnings to refrain from harassing conduct, reprimands, and warnings over future misconduct.[89]

Each time Officer Facemyer complained to the administration, the administration immediately and promptly investigated her complaints.  As a result of each investigation, Officer Cid received a number of verbal warnings regarding his conduct.[90]  Both Officers Cid and Facemyer received letters of warning regarding their unprofessional conduct.[91]  At the conclusion of the UALD investigation, Ms. Miller found that Ms. "Ockey addressed [Ms.] Facemyer's complaints in a timely and professional manner.  Additionally, there was no evidence of wrongful discipline or unfair assignments."[92]  Ms. Miller also found that Mr. McLeod had

---

[87] *Id.*; *see also Knabe v. The Boury Corp.*, 114 F.3d 407, 412 (3d Cir. 1997).

[88] *Adler*, 144 F.3d at 376.

[89] *Id.*

[90] Ockey Decl. at ¶ 8, 9, 11.

[91] Eldredge Decl. at ¶¶ 15-17.

[92] Miller Decl. at ¶ 10.

properly addressed Officer Facemyer's complaint.[93]  Furthermore, Ms. Miller found that Mr. Renckert reported all of Officer Facemyer's complaints to the administration and that he "appropriately addressed her complaints in a timely and professional manner."[94]

Officer Facemyer states that a number of comments by Officer Cid stopped after her first complaint,[95] but she does testify that Officer Cid continued to view improper pictures on the computers after she had complained.  Although she could identify two separate occasions that Officer Cid viewed women in bikinis at the Hard Rock Hotel website at the workplace,[96] she fails to identify any further occasions in her testimony.  Indeed, she fails to provide any further testimony that Officer Cid failed to stop these activities, other than her vague assertion that "there were constant complaints from other staff" and that his use of these websites did not stop after he complaints.[97]  Given that Officer Facemyer has alleged two separate occasions of improper internet use, and offered only general allegations that this use did not stop after her complaints, the court fails to see how Officer Facemyer has demonstrated reasonable evidence upon which a reasonable factfinder could infer the existence of a hostile work environment, or that the DOC did not reasonably and adequately respond to Officer Facemyer's complaints.

It appears absent the allegations about improper website viewing, every complaint lodged

---

[93] *Id*. at ¶ 9.

[94] Miller Decl. at ¶ 12.

[95] Facemyer Depo. at 47:16-19.

[96] *Id*. at 42:2-44:10.

[97] *Id*. at 42:10-18.

by Officer Facemyer resulted in investigation, a warning or reprimand, and stoppage.  Indeed, the

DOC is only required to reasonably respond when faced with harassment complaints.[98]  Officer

Facemyer clearly states in her deposition that after she made the complaints to Ms. Ockey and

Mr. Renckert, she did not complain to her direct supervisors further.[99]   It is clear that each time

Officer Facemyer brought a complaint to the DOC, DOC administration officials investigated

that complaint and responded to any substantiated complaint.

Officer Facemyer argues, however, that the verbal warnings given to Officer Cid did not

adequately respond to his "continuing pattern of misbehavior."[100]  "The employer is . . . obliged

to respond to any repeat conduct," although the response by the employer still must be reasonable

to avoid employer liability.[101]  DOC officials clearly investigated and discussed each lodged

complaint with Officer Cid each time Officer Facemyer complained about his conduct.[102]  Oral

warnings to refrain from harassing conduct are an appropriate response, especially given that a

number of the incidents did not tie into Officer Facemyer's gender.  Each warning Officer Cid

received responded to a different allegation made by Officer Facemyer.  These topics ranged

from Officer Facemyer's disagreement regarding the proper method of treating offenders to

Officer Cid's accidentally stepping on her toes to his teasing Officer Facemyer about her

---

[98] *Adler*, 144 F.3d at 676.

[99]  Facemyer Depo. at 54:1-10.

[100] Plaintiff's Memo. in Opp. of Sum. Judg. at 18.

[101] *Adler*, 144 F.3d at 676.

[102] Deposition of Officer Cid at 12.

backpack.  The DOC specifically dealt with each of the allegations, and gave Officer Cid verbal warnings about each of these incidents.

The DOC discharged its obligations under the law.  DOC management's investigations of Officer Facemyer's complaints occurred promptly after she lodged any complaints, and investigations into her complaints to Mr. Cardall and the UALD both occurred within four to six weeks of her lodged complaints.  Ultimately, Officer Cid transferred to a different center in order to alleviate his differences with Officer Facemyer.  The DOC's responses, including prompt investigations, verbal warnings, and letters of reprimand to certain offenders appears reasonable to the court.  According to the standards discussed in *Adler v. Wal-Mart Stores*,[103] Officer Facemyer has failed to present sufficient evidence to establish that the DOC inadequately responded to incidents of harassment of which it knew or should have known.  The record demonstrates that the DOC's responses to "each incident of which it had actual or constructive knowledge were prompt and either effective or proportional to the seriousness and frequency of the incidents, and therefore [] reasonably calculated to end the harassment."[104]  Officer Facemyer has not provided further evidence to demonstrate that she further complained to her supervisors if any of the harassment continued, or that the gender-based harassment failed to cease and that the DOC was aware that it had not ceased.  Therefore, Officer Facemyer's hostile work environment claim fails, and summary judgment is appropriate on this issue.

*B. Sexual Discrimination*

---

[103] 144 F.3d 664.

[104] *Adler*, 144 F.3d at 677.

Under Title VII, it is "unlawful employment practice for an employer . . . to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment because of such individual's . . . sex."[105]  In determining whether discrimination occurred based on sex, Officer Facemyer must provide evidence so that a factfinder "could infer the plaintiff was harassed because she is a woman."[106]  "If the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination as a result of that environment."[107]  To make a claim of sexual discrimination, Officer Facemyer must show that (1) she belongs to a protected class, (2) she was performing satisfactory work, (3) she was subjected to "adverse action" by the employer, and (4) she was treated less favorably than others outside the protected class.[108]

The court determines an adverse employment action on a case-by-case basis.[109]  Examples of adverse employment actions include "'firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant changes in benefits.'"[110]  Although the Tenth Circuit liberally defines an adverse employment action, the court must "examin[e] the unique facts relevant to the situation at hand," to determine whether the employer

---

[105] 42 U.S.C. § 2000e-2(a)(1).

[106]  *Penry v. Federal Home Loan Bank of Topeka*, 155 F.3d 1257, 1261 (10th Cir. 1998)

[107] *Stahl v. Sun Microsystems, Inc.*, 19 F.3d 533, 538 (10th Cir. 1994).

[108] *Goodwin v. General Motors Corp.*, 275 F.3d 1005, 1012 (10th Cir. 2002).

[109] *Heno v. Spring/United Mgmt. Co.*, 208 F.3d 847, 857 (10th Cir. 2000).

[110] *Aquilino v. Univ of Kansas*., 268 F.3d 930, 934 (10th Cir. 2001) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 762 (1998)).

took such an action.[111]

In the case of sexual discrimination based on failure to promote, Officer Facemyer first meets her burden by establishing a prima facie case of discrimination.  The DOC must then provide a legitimate, nondiscriminatory reason for not selecting her for the position for which she applied.[112]  After the DOC has satisfied this burden to provide a facially nondiscriminatory reason for its action, the burden shifts back to Officer Facemyer who must show that the proffered reason is pretextual.[113]  "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."[114]  "Mere conjecture that [the] employer's explanation is a pretext for intentional discrimination[, however,] is an insufficient basis for denial of summary judgment."[115]  Once the DOC meets its burden, Officer Facemyer must provide more than her ideas or thoughts to demonstrate pretext on the part of the DOC.

The DOC concedes that Officer Facemyer is a member of a protected class.  It also concedes that Officer Facemyer performed satisfactory work as a correctional officer, with the

---

[111] *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998).

[112] *Id*. at 531.

[113] *Id*.

[114] *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quotations omitted).

[115] *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988).

exception of her unsuccessful ratings on interpersonal communication skills and professionalism.[116]  Officer Facemyer argues that the DOC subjected her to adverse employment actions, especially as by failing to promote her and instead promoting less qualified male applicants.  She further argues that she received less desirable work assignments and was subjected to different workplace standards than her male counterparts.  Finally, she received letters of warning from the DOC, which may arguably constitute adverse employment actions.  The DOC denies these contentions, arguing that Officer Facemyer received no adverse employment actions based on alleged discrimination.

### 1. Failure to Promote

First, Officer Facemyer complains that the DOC failed to promote her twice, thereby subjecting her to an adverse employment action based on her gender.  She alleges that the DOC promoted two male employees instead, and states that neither of those employees had CAT I certification or a college degree.[117]  Notably, the court fails to find any reference provided by Officer Facemyer demonstrating that the positions she applied for required a college degree or CAT I certification, nor any indication that these positions preferred someone with those qualifications.  Despite this lack of evidence, the court assumes for the sake of this motion that Officer Facemyer has met her burden to show a prima facie case by the DOC's failure to promote her.  The burden then shifts to the DOC.

In his deposition, Mr. Cardall explained that agent position promotions are determined by

---

[116] Def's Memo. in Sup. of Summ. Judg. at 30.

[117] Facemyer Depo. at 78:2-16.

the score that a panel gives each applicant based on a variety of factors, including an interview.[118]

Mr. Cardall testified that he hired an agent applicant based solely upon that score.[119]  Although

Mr. Cardall stated that he could not remember Officer Facemyer's specific numerical score, he

did state that the hiring was done strictly by the highest score, because "if she had scored–you

know, in the top, she would have made the agent jobs."[120]

Neither party provides Officer Facemyer's score or those of her competitors for each of

the agent jobs for which she applied.  Mr. Cardall states in his deposition when asked for

documentation about hiring; "You could get it. You could see exactly where she scored. But I

can tell you right now, that she did not score high enough to get an agent because she's not an

agent."[121]

Officer Facemyer does not provide any further documentation regarding her scores or

application to the court.  She states that Mr. Cardall told her in an e-mail that it was because she

did not use all of her interview time.[122]  The e-mail communication provided to the court

demonstrates that Mr. Cardall told Officer Facemyer that she did not score high enough on her

interview.[123]  In that e-mail correspondence, Mr. Cardall advised her to use all of her interview

---

[118] Cardall Depo. at 42:17-43:4.

[119] *Id*. at 42:1-16.

[120] *Id*. at 42:7-9.

[121] *Id*. at 50:8-11.

[122] Cardall Depo. Ex. 1.

[123] *Id*.

time next time.  While it is not completely clear that the DOC penalized Officer Facemyer for not using all of her interview time, it is clear that she simply did not score high enough on her application to receive the promotion.[124]

The DOC has provided to the court its process for determining agent promotions.  The panel, which did not include any of Officer Facemyer's supervisors, determined the scores based on the application and the interviews.  There is no indication that Officer Facemyer received lower scores because of her gender, nor is there any indication provided by any party that female applicants have generally received lower scores.  The court is left with a process that ran strictly by the numbers, and it does not appear that the DOC altered its process to hinder Officer Facemyer's chances because of her gender.  The court finds that the DOC has met its burden of demonstrating a non-pretextual, legitimate reason for failing to promote Officer Facemyer, namely that she failed to score higher than other applicants.  The burden shifts back to Officer Facemyer, who fails to provide any further evidence to the court that the DOC's proffered reasons are pretext.  Accordingly, Officer Facemyer's claim of discrimination based on the DOC's failure to promote her fails as a matter of law.

### 2. Less Desirable Assignments and Different Workplace Standards

Officer Facemyer also complains that she received less desirable assignments, such as kitchen duty and weekly treatment team (although Officer Facemyer fails to explain who assigned her to treatment duty).[125]  She further alleges that the DOC subjected her to different

---

[124] Cardall Depo. at 50:8-11; Ex. 1; Pl's Memo. in Opp. of Summ. Judg., Ex. F.

[125] Facemyer Depo. at 65:22-24.

workplace standards than her male counterparts.  She complains that she received discipline for signing off on money transfers when others did the same thing and received no discipline.  And she further complains that the DOC prohibited her from participating in inmate transfers.  Finally, she complains that a number of her subordinate male co-workers undermined her authority.[126]  All of this, she argues, constituted adverse employment actions and lead to the DOC's discriminatory conduct against her.

While these allegations are (if true) disturbing, none of them demonstrate that the DOC took any adverse employment action against Officer Facemyer.  Examples of adverse employment actions include "'firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant changes in benefits.'"[127]  A fellow co-worker undermining Officer Facemyer's authority does not demonstrate any adverse employment action on the part of the DOC.  Furthermore, Officer Facemyer's complaint regarding discipline for signing an offender's money transfer does not appear to be an adverse employment action.  Officer Facemyer does not indicate who prohibited her from engaging in this activity, nor does she demonstrate how this activity related to any of her responsibilities.  Nor does she offer any evidence indicating that male officers were allowed to sign money transfers for offenders without being disciplined or that any  discipline she received was due to her gender.

Officer Facemyer also fails to demonstrate any adverse employment action due to

---

[126] *Id.*

[127] *Aquilino v. Univ of Kansas*., 268 F.3d 930, 934 (10th Cir. 2001) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 762 (1998)).

allegations that the DOC barred her from inmate transfers. Even if such a bar was a modest step-down in responsibility and that could be construed as an adverse employment action, the DOC offers relevant, non-pretextual legitimate reasons for the action that shifts the burden to prove pretext back to Officer Facemyer. Indeed, in her own deposition, Officer Facemyer testified that Officer Jackson might not have taken her on transports because he did not like her,[128] and it is clear that Officer Jackson was not any direct supervisor over Officer Facemyer. Many of the statements made by Officer Facemyer suggest that her co-workers did not like her, rather than discrimination by the DOC. Accordingly, the court believes that Officer Facemyer has not adequately met her burden to show that any of these co-worker actions were adverse employment actions, or that any of the proffered reasons for these actions are mere pretext.

Officer Facemyer's kitchen duty assignment might be viewed as an adverse employment action. Officer Facemyer testifies that kitchen duty consists of "supervis[ing] two inmate cooks, . . . . And you have to make sure the food is correct, check the freezers, check all the utensils and all that kind of stuff."[129] She "asked to be taken off of that, [because she] wanted to do something different."[130] She asked Mr. Renckert to remove her from kitchen duty, "because it seemed that the men were allowed to go to training for firearms, instructors, things like that, but [she] wasn't allowed to go. And they said that [her] extra duty was the kitchen, and that's where

---

[128] Facemyer Depo. at 119:4-11.

[129] *Id*. at 63:9-13.

[130] *Id*. at 63:13-15.

[she] needed to stay."[131]  She states in her deposition that Mr. Renckert told her that she needed

to stay on kitchen duty, and that she asked other male staff about it as well.  It is unclear,

however, when she discussed this with Mr. Renckert, but it is clear that she discussed this with

Mr. Cardall.  While this is a close question, there is no indication, other than her statement in the

deposition, that Officer Facemyer suffered an adverse employment action based on her gender

from her assignment to kitchen duty.  Throughout, Officer Facemyer received the same pay,

benefits and responsibilities as other Shift Leaders, but Officer Facemyer contends that this extra

duty of kitchen duty did not go to all of the Shift Leaders.

     In response, the DOC provides statements by Officer Cid (of whom Officer Facemyer

does not complain about regarding this particular issue).  Officer Cid testifies that the officer who

assigns others to both kitchen duty and prison transports is "the shift leader in charge."[132]  Officer

Facemyer, as Shift Leader, could have presumably determined who would be assigned to these

duties, especially including kitchen duty.  Although Officer Facemyer complains that Mr.

Renckert would not assign her to a different duty, Officer Facemyer's position as Shift Leader

offered her the discretion to assign such duties.  Officer Facemyer provides no rebuttal to this

explanation by the DOC.

     Viewing the facts in the light most favorable to Officer Facemyer, the court is unclear

how Officer Facemyer's assignments, whether to kitchen duty or to the treatment team, are

adverse employment actions.  This is especially true if the Shift Leader, as Officer Cid testifies,

---

[131] *Id*. at 63:17-24.

[132] Cid Depo. at 40-41.

had the discretion to determine the assignments during the shift.  Officer Facemyer fails to explain how the Shift Leader – herself – (at least during most of the relevant time of this complaint) was unfairly assigned to kitchen duty if the Shift Leader made the assignments for the shift.

Officer Facemyer further argues that the DOC discriminated against her by transferring her from Freemont to Bonneville.  When the DOC transferred her, she kept her rank, salary step, rate of pay, and benefits.[133]  She did work in a secretary/clerical position upon arrival at Bonneville for first three to four months, but immediately received a correctional officer position once one became available at Bonneville.[134]  It is clear that Officer Facemyer kept her same pay and benefits in the Bonneville position.  Indeed, she also agrees that the correctional officer position was not available at the time of transfer, but that the DOC placed her in that position as soon as one became available.[135]  The DOC states that although it did transfer Officer Facemyer, that she received the same responsibilities and benefits within several months.  Officer Facemyer does not specifically respond to the DOC's position, nor does it appear that she argues she was discriminated against by the transfer and receiving different responsibilities for the three or four months Bonneville did not have her position available.  Therefore, it is reasonable to conclude that the DOC's transfer of Officer Facemyer and to immediately move her into her original position upon its availability, did not result in a pretextual adverse employment action.

---

[133] *Id*. at 87:10-17.

[134] *Id*. at 87:1-9.

[135] *Id*.

### 3. *Letters of Warning.*

Finally, Officer Facemyer has claimed that she received two letters of warning constituting adverse employment actions by the DOC.  She cites these letters as part of her retaliation claim, rather than including the issuance of these letters as adverse employment actions under her sexual discrimination claim.  Indeed, such letters can be "adverse employment actions" under Tenth Circuit law.[136]  Such a letter, however, only "constitute[s] an adverse employment action if it adversely affects the terms and conditions of the plaintiffs employment – for example, if it affects the likelihood that the plaintiff will be terminated, undermines the plaintiff's current position, or affects the plaintiff's future employment opportunities."[137]  According to her opposition memorandum, Officer Facemyer brings these letters of warning only as evidence of retaliation, rather than discrimination, and the court deals with these letters in the section below.  As for the argument that these letters are evidence of sexual discrimination, Officer Facemyer has waived this argument by not bringing it to the attention of the court.

Given the court's discussion above, the court finds summary judgment appropriate on Officer Facemyer's discrimination claims.

### C. Retaliation

In the absence of direct evidence of retaliation, retaliation claims are subject to the

---

[136] *Medina v. Income Support Div.*, 413 F.3d 1131, 1136 (10th Cir. 2005).

[137]  *Id.* at 1137 (quoting *Roberts v. Roadway Express, Inc.*, 139 F.3d 1098, 1104 (10th Cir. 1998)).

*McDonnell-Douglas Corp. v. Green*[138] burden shifting framework.[139]  Under *McDonnell-Douglas*

and the Tenth Circuit's framework, the plaintiff can establish a prima facie Title VII retaliation

claim by demonstrating that action was taken against her and (1) she engaged in protected

opposition to Title VII discrimination, (2) that a reasonable employee would have found the

challenged action materially adverse, and (3) that a causal connection existed between the

protected activity and the adverse employment action.[140]  Previously, the court would have

required an "adverse employment action," but the Supreme Court's newly announced standard in

*Burlington Northern & Santa Fe Ry. Co. v. White*[141] has altered the second prong of this standard.

Now, to prevail on a Title VII retaliation claim, the plaintiff need only show "that a reasonable

employee would have found the challenged action materially adverse, which in this context

means it well might have dissuaded a reasonable worker from making or supporting a charge of

discrimination."[142]

Under the anti-retaliation provision, employer actions must be "harmful to the point that

they could well dissuade a reasonable worked from making or supporting a charge of

discrimination."[143]  Indeed, the "anti-retaliation provision seeks to prevent employer interference

---

[138] 411 U.S. 792 (1973).

[139] *Burrus v. United Telephone Co. F Kansas, Inc.*, 683 F.2d 339, 343 (10th Cir. 1982).

[140] *Argo v. Blue Cross & Blue Shield*, 452 F.3d 1193, 1202 (10th Cir. 2006); *see also Meiners v. Univ. of Kansas*, 359 F.3d 122, 1229 (10th Cir. 2004).

[141] 126 S. Ct. 2405, 2414-15 (2006).

[142] *Argo*, 452 F.3d at 1202 n.2 (citations and quotations omitted).

[143] *Burlington Northern*, 126 S. Ct. at 2409.

with 'unfettered access' to Title VII's remedial mechanisms. . . .  And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence."[144]

Despite the Supreme Court's alteration of the second prong for retaliation claims, the *McDonnell Douglas* burden-shifting framework still applies.[145]  If Officer Facemyer can establish a prima facie case, the burden of production shifts to the defendant to "articulate a legitimate, nondiscriminatory reason for the action."[146]  Officer Facemyer must then show that the DOC's proffered reasons are pretextual for the action that a reasonable employee would have materially adverse.[147]  To meet her burden, Officer Facemyer must demonstrate "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contractions' in her employer's proffered reason such that 'a reasonable factfinder could rationally find them unworthy of credence.'"[148]

Officer Facemyer alleges that the DOC subjected her to retaliation by co-worker harassment, letters of warning, and denying her two promotions after she filed her formal complaints.[149]  The DOC denies these allegations, and proffers specific reasons for the letters of warning and the denial of promotions.

*1. Officer Facemyer Has Not Demonstrated Sufficient Employer Liability for Co-Worker*

---

[144] *Id*. at 2415.

[145] *Id*.

[146] *Wells v. Colo. Dept. Of Transp.*, 325 F.3d 1205, 1212 (10th Cir. 2003).

[147] *Id.*

[148] *Medina*, 413 F.3d at 1136 (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (internal citations omitted)).

[149] Plaintiff's Memo. in Opp of Sum. Judg. at 22.

*Hostility to Allege Retaliation.*

Hostility or retaliatory harassment by co-workers can rise to the level of adverse employment action only if the hostility or harassment is sufficiently severe.[150]  The Tenth Circuit has held that "an employer can only be liable for co-workers' retaliatory harassment where its supervisory or management personnel either (1) orchestrate the harassment or (2) know about the harassment and acquiesce in it in such a manner as to condone and encourage the co-workers' actions."[151]

Officer Facemyer alleges in her statement of facts that Officer Cid would "lash out at her" after she filed a complaint.  She alleges that her co-workers called her a snitch, subjected her to physical retaliatory acts, spread rumors that she slept with offenders, was pregnant and taking drugs.[152]  She further testified that Officer Cid intentionally stepped on her toes, elbowed her in the chest and one time shoved a chair on rollers into her.[153]  She offers only her deposition statements as proof of these allegations.

It is clear that the DOC investigated a number of these complaints, including the physical retaliation complaint.  Ms. Miller found in her investigation that she could not substantiate many of these claims.  Officer Cid denied intentionally stepping on Officer Facemyer's toes, but did

---

[150] *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1264 (10th Cir. 1998).

[151] *Id*. at 1265.

[152] Plaintiff's Memo. in Opp. of Sum. Judg. at ¶¶ 29-33.

[153] Facemyer Depo. at 56:12-57:18.

state that he might have done it accidently.[154]  Ms. Miller also investigated other issues raised by

Officer Facemyer that encompass her co-worker retaliation complaints.[155]

Officer Facemyer has not offered any evidence that the DOC orchestrated co-worker

hostility or retaliation for her lodged complaints.  The DOC investigated all of the complaints

lodged by Officer Facemyer, which clearly demonstrates that it did not acquiesce in co-worker

hostility or retaliation.  Officer Facemyer has not met her burden in *Gunnell v. Utah Valley State*

*College*[156] by providing evidence from which a reasonable factfinder could conclude that the

DOC either orchestrated or acquiesced in co-worker hostility and retaliation.  On this part of her

retaliation claim, Officer Facemyer's case fails and summary judgment is appropriate.

*2. Letters of Warning*

The court first considered this case without the help of the *Burlington Northern* standard,

so it discussed at oral argument the fact that letters of warning and reprimands might be

considered "adverse employment actions" as retaliation for lodging complaints.[157]  In the new

*Burlington Northern* context, however, the court must examine these letters in a different light;

namely, whether a reasonable employee would have found the challenged action (the letters of

warning) materially adverse.[158]  Both sides kindly provided supplemental briefs at the request of

---

[154] Miller Decl. at ¶ 8.

[155] *Id*. at ¶ 2.

[156] 152 F.3d at 1264.

[157] *Medina*, 413 F.3d at 1134.

[158] *Burlington Northern*, 126 S.Ct. at 2414-15.

the court as to the effect of *Burlington Northern* on this case.

Officer Facemyer provides the two letters that she received from the DOC during the relevant time period of this suit (although there also appears to be a further letter dated January 2006, which the court will not consider). The DOC issued the first letter of warning after Mr. McLelland completed his investigation. That letter indicates that Mr. McLelland found instances of unprofessional behavior and violations of the Code of Conduct by both Officers and Officer Facemyer.[159] Specifically, that letter states that the DOC investigated all of Officer Facemyer's allegations and that it would address all of the substantiated violations with the staff members involved. As part of the investigation, staff members provided their own complaints against Officer Facemyer for causing a hostile work environment.[160] This letter enumerates Officer Facemyer's substantiated unprofessional behavior such as using vulgar language with staff and offenders.[161] The letter became part of Officer Facemyer's work history for six months, after which she could request the Division Director to remove the warning from the file as long as Officer Facemyer was not under investigation or had been disciplined during that six-month period.[162] Officer Facemyer received the information regarding these complaints during her interview with Mr. McLelland and Ms. Eldredge on February 2, 2004.[163]

---

[159] Eldredge Decl. at ¶ 15.

[160] Facemyer Depo., Ex. 2 (Letter of Warning, Mar. 5, 2005).

[161] *Id*.

[162] *Id*.

[163] Eldredge Decl., Ex. 2 (Letter of Warning, Sept. 9, 2004).

The DOC issued its second letter of warning due to Officer Facemyer's persistent interpersonal communication problems, stating that her behavior "deteriorated to a very corrosive and unprofessional level."[164]  The letter cites her behavior as "confrontational and demeaning," noting that she criticized other coworker's performances resulting in "embarrassment and humiliation."  It further notes that she was frequently absent and isolated, and that she displayed unprofessional and insubordinate behavior in meetings with her supervisor.[165]  Although the DOC states this letter resulted from the UALD investigation,[166] the letter appears to have been issued two days prior to Ms. Miller beginning her UALD investigation.[167]  It appears likely that the DOC issued the second letter six months to the week after the first letter as a six-month follow-up.

Officer Facemyer cites the Tenth Circuit's holding in *Medina v. Income Support Division* to argue that the DOC's letters of warning constituted retaliatory actions.  In *Medina*, the plaintiff received a warning specifically accusing her of knowingly or maliciously bringing false claims to the Human Resource department.[168]  The Tenth Circuit determined that this warning fell short of an adverse employment action because the plaintiff had already been offered a job elsewhere, the letter was not placed in her personnel file, and there was no evidence to show that the letter had

---

[164] *Id.*

[165] *Id.*

[166] Defendant's Memo in Sup of Sum. Judg. at 34

[167] Letter of Warning, September 9, 2004; Miller Decl. at ¶ 3.

[168] *Medina,* 413 F.3d at 1133-1134.

been discovered by a future employer or would be in the future. *Medina* relied on the Tenth

Circuit's holding in *Roberts v. Roadway Express*,[169] which states that letters of warning can

constitute adverse employment action. In *Roberts*, however, the plaintiff received "twenty

warning letters, two suspensions, and one termination" within a two-year period subsequent to

his written complaint of discrimination.[170]

     The Supreme Court has explained that "context matters," and the court must look at what

a reasonable employee would consider the action taken by the employer for retaliation claims.

Officer Facemyer argues in her supplemental brief that she has "identified multiple actions of her

employer which constitute retaliatory actions,"[171] including the fact that she filed a complaint of

harassment with the DOC and then later received a letter of warning. She further argues that the

close temporal proximity of the letter of warning with her discrimination complaints satisfied the

new *Burlington Northern* standard. Ultimately, she argues that "[a]bsent evidence or reasoning,

the real question is whether the Defendant's reason for issuing the Letters of Warning can be

viewed as pretextual."[172]

     The DOC argues that it issued the letters of warning for legitimate reasons, all set forth in

the letters of warning.[173] As discussed previously, the DOC offered a number of reasons for the

---

[169] 139 F.3d 1098.

[170] *Roberts*, 149 F.3d at 1104.

[171] Pl's Suppl. Memo., Docket No. 51, at 3 (Aug. 11, 2006).

[172] *Id*. at 5.

[173] Def's Memo. in Sup. of Summ. Judg. at 32-33; Letter of Warning, Mar. 5, 2004.

letters, including her aggressive, confrontational and demeaning interactions with staff and offenders, her criticizing and ridiculing staff performance, her frequent absenteeism, isolation and irritability, and her unprofessional and insubordinate behavior during meetings with her supervisors.  Officer Facemyer complains, however, that she did not receive any verbal warnings about her behavior prior to receiving these letters of warning, whereas Officer Cid received numerous verbal warnings prior to receiving a letter of warning.  At one point, the record demonstrates she did receive certain verbal warnings, as at one point Mr. Renckert and Mr. MacLeod counseled her "about her lack of communication skills and her unprofessional behavior, including referring to a co-worker as a 'fucking bitch' during a meeting," before she complained to Mr. Cardall.[174]  But, it is also clear that the DOC at least gave Officer Cid numerous verbal warnings prior to issuing his letter of warning, while Officer Facemyer did not receive the same number of warnings.

This appears a close issue to the court.  Although the DOC argues that the disparate treatment between Officer Cid's verbal warnings and Officer Facemyer's verbal warnings should not apply to the retaliation claim, it is clear that "[c]ontext matters."[175]  Staff clearly discussed Officer Facemyer's communication and interpersonal skills deficiencies in several meetings with her.  And during the DOC's investigation, the DOC received numerous complaints about Officer Facemyer's lack of professionalism.  The DOC's administrators investigated the complaints, finding on several different occasions that Officer Facemyer's actions lacked the requisite

---

[174] Ockey Decl. at ¶ 18; Facemyer Depo. at 80:11-13.

[175] *Burlington Northern*, 126 S. Ct. at 2415.

professionalism.  But the DOC clearly did not provide her the *numerous* warnings it provided

Officer Cid before taking an action.  This treatment can arguably be shown to be retaliatory to the

factfinder.  It is reasonable for an employee to find these letters of warning, without the same

verbal warnings given to a close co-worker, materially adverse to the point of dissuading a

reasonable worker from making or supporting a charge of discrimination.  Even if Officer

Facemyer received a verbal warning one month before the first letter of warning,[176] the DOC only

accounts for this *one* verbal warning, while the court can count many more than that for Officer

Cid.  No doubt a reasonable employee might have expect more verbal warnings before he or she

too received a letter of warning from the DOC – and context certainly matters here.

　　　　While the issue is very close, the court finds that summary judgment can not be granted

on this *one* issue – the letters of warning as retaliation for Officer Facemyer's submission of

sexual harassment and discrimination complaints.  Under *Burlington Northern*, and the DOC

concedes, that the retaliation/material adversity "standard does *not* require a reviewing court or

jury to consider the nature of the discrimination that let to the filing of the charge.  Rather, the

standard is tied to the challenged retaliatory act, not the underlying conduct that forms the basis

of the Title VII complaint."[177]  Therefore, the court is confident that *only* the evidence directly

relating to this particular issue, rather than any of the discrimination or sexual harassment claims

for which the court has already granted summary judgment, will be brought to a factfinder  The

court plans on keeping a very tight leash on the scope of evidence brought regarding this issue.

---

[176] Pl's Suppl. Memo, Docket No. 50, at 6 (Aug. 1, 2006).

[177] *Burlington Northern*, 126 S. Ct. at 2416 (internal quotations and citations omitted).

*C. Officer Facemyer's Failure to Promote Claim Due to Retaliation is Unpersuasive.*

The court earlier addressed Officer Facemyer's failure to promote claim.[178]  As stated, even if Officer Facemyer faced retaliation for filing her complaints, the DOC has provided a legitimate reason for its decision – that she did not score high enough in the application process and the panel took the highest scores.  Mr. Cardall provided legitimate reasons for not promoting Officer Facemyer in his description of the hiring process, especially as he noted that the DOC took the highest performing applicants.

Officer Facemyer has failed to introduce evidence showing that the DOC's failure to promote her was pretext.  Officer Facemyer offers only conversation between herself and Mr. Renckert after she applied for the second promotion.  She alleges that he told her she would not receive a promotion because she filed a grievance in January and that "he didn't know if I would ever be promoted."[179]  This is the same agent application in which Mr. Cardall testified that Officer Facemyer simply did not score high enough to be selected.[180]  Mr. Cardall states that while supervisors can participate in an interviewing panel, he does not believe that Mr. Reckert was on Officer Facemyer's interviewing panel because "[h]e was a supervisor at the center.  We interviewed for agent through the Region III office. So [Mr.] Renckert, to my knowledge,

---

[178] *See supra* section B(1).

[179] Facemyer Depo. at 76:10-78:1.

[180] *See supra* section B(1).

wouldn't even have knowledge of that."[181]  Mr. Renckert was not on the interviewing panel for this position (and Officer Facemyer does not allege that he was on the interviewing panel), nor is it clear that he provided any substantive information regarding Officer Facemyer's application for promotion.  And Officer Facemyer has not provided any evidence demonstrating that her interview panel had any knowledge of her complaints to the DOC.  Nor does she allege that any of the interview panel had any indication that she had filed any complaints with the DOC. Taking Officer Facemyer's allegations in the light most favorable to her, she has not demonstrated evidence that would lead a reasonable factfinder to find that the DOC retaliated against her by not promoting her.  Even if Mr. Renckert made the comment that Officer Facemyer attributes to him, she offers no evidence that he was the decisionmaker on her promotion, nor does she offer any evidence that he played any role in the decision regarding her promotion.  According to the testimony of the actual decisionmaker, Officer Facemyer did not score high enough on her application to warrant the promotion, and Officer Facemyer provides no evidence that would lead a reasonable factfinder to find that she was denied the promotion due to retaliation.  Officer Facemyer has clearly not met her burden to show that the DOC's legitimate reasons are mere pretext.  Nor has she provided evidence that supports her claim that a reasonable person would have been dissuaded from filing a complaint, especially given that the DOC strictly followed its numeric ranking system to grant promotions.

     Given the discussion above, the court finds that no reasonable factfinder could find in favor of Officer Facemyer's retaliation claim on this failure to promote issue.  Therefore,

---

[181] Cardall Depo. at 43:5-13.

summary judgment is appropriate on this part of her claim.  Overall, the only claim left for

Officer Facemyer is her retaliation claim regarding the letters of warning.

## CONCLUSION

Officer Facemyer has failed to meet her respective burdens on her hostile work

environment, sex discrimination and most of her retaliation claims.  Therefore, summary

judgment on those claims is appropriate.  Summary judgment on her one remaining claim,

retaliation by the DOC through the letters of warning, is not appropriate.  The court GRANTS IN

PART AND DENIES IN PART the DOC's motion for summary judgment [#38].  Within ten

days of this order, the parties shall contact the magistrate judge to arrange for a settlement

conference to be held within thirty-five days of such order.  Because the previous trial date was

stricken, the court sets the matter for a three-day bench trial on December 11 through 13, 2006.

A final pre-trial conference will be held on November 15, 2006, at 3:00 p.m.  The parties are

directed to meet and confer on proposed jury instructions and to jointly submit a proposed pre-

trial order and agreed and disputed jury instructions one week before the final pre-trial

conference.

SO ORDERED.

DATED this 22nd day of September, 2006.

BY THE COURT:

_____

Paul G. Cassell

United States District Judge